UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
LINDA SANTISI,

                      Plaintiff,            **MEMORANDUM OF DECISION
                                                                             AND ORDER**
                                                                             03-CV-3847 (DRH) (MLO)

          - against -

SOUTH HUNTINGTON UNION FREE
SCHOOL DISTRICT,

                      Defendant.
----------------------------------------------------------X

**A P P E A R A N C E S :**

**DAVID M. FISH**, **ESQ.**
Attorney for Plaintiff
500 Fifth Avenue
Suite 5100
New York, New York 10110

**INGERMAN SMITH, L.L.P**
Attorneys for Defendant
167 Main Street
Northport, New York 11768
By: Christopher Venator, Esq.

**HURLEY, District Judge:**

        Plaintiff Linda Santisi ("Plaintiff") filed the present action, pursuant to 42 U.S.C. § 1983 ("Section 1983"), claiming that defendant South Huntington Union Free School District ("Defendant" or the "District") eliminated her position in retaliation, inter alia, for comments she made regarding the District's potential purchase of a computer software program in violation of her rights under the First and Fourteenth Amendments. Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow,

Defendant's motion is granted and this case is dismissed in its entirety.[1]

*BACKGROUND*

The material facts, drawn from the Complaint and the parties' Local 56.1 Statements, are undisputed unless otherwise noted. Plaintiff began working for the District in December 1985 as a Senior Program Analyst. In 1995, Plaintiff's title changed to Supervisor of Data Processing and Payroll. In 1999, the District purchased a comprehensive software program called Open Plus to facilitate many of its business and operational needs. Plaintiff worked extensively with this program.

### I. *The Purchase of the New Software Program*

Stanley Germain ("Germain") worked for the District as the interim Business Manager from approximately February 1, 2001 to June 1, 2001. During his brief tenure at the District, Germain recommended that the District purchase Finance Manager, which is an alternative software program to Open Plus. According to the District, the Board of Education (the "Board") was hesitant to purchase new software because it recently purchased Open Plus and a new software program would be expensive. (Def.'s Rule 56.1 Stmt. ¶ 6.) The Board did not want to spend more money on costly software until it determined that the purchase was necessary. (*Id.* ¶ 7.) Nevertheless, the Board investigated other software programs in 2001 because Open Plus, its current program, did not have a payroll function. (*Id.* ¶ 8.)

According to Plaintiff, she suggested that she personally evaluate the proposed new software. (Pl.'s Aff., dated Aug. 3, 2005 ("Pl.'s Aff."), ¶ 4.) After her evaluation, she

---

[1] In opposition to the instant motion, Plaintiff has withdrawn her second federal cause of action and her first and second pendent state-law claims. Accordingly, only the first cause of action, asserting a violation of Section 1983, remains.

-2-

submitted a memorandum to Germain, dated May 4, 2001, outlining the strengths and weaknesses of Finance Manager. (*See* Pl.'s Ex. A.)

Thereafter, on May 7, 2001, Plaintiff made an oral report to the Board. Plaintiff claims that she took a "strong position against Finance Manager" at the meeting. (Pl.'s Aff. ¶ 7.) The parties agree that Plaintiff informed the Board that she was not in favor of a quick decision to purchase new software and that she advised the Board to deliberate carefully. It is similarly undisputed that the Board agreed with Plaintiff's advice and decided to delay the purchase.

Plaintiff claims that because of her disapproval of the program, two District employees became hostile to her. First, she claims that Germain, "the original proponent of Finance Manager, was obviously frustrated and annoyed by [her] efforts for the District." (Pl.'s Aff. ¶ 10.) Next, she claims that Dr. Timothy C. Brennan, the Superintendent of Schools for the District ("Dr. Brennan"), was "angry with the public position [she] took" over Finance Manager because he wanted the program for his own personal reasons. (*Id.* ¶ 12.) On May 8, 2001, Plaintiff sent an e-mail to Jim Kaden, who apparently is a District employee, hoping to get the "Board's protection from the horrible treatment [she] was experiencing from Germain and Dr. Brennan." (*Id.* ¶ 15.)

The issue of the District's potential purchase of new software was re-visited one year later, sometime in 2002. At that time, the Board voted to purchase a software system known as Win Cap. Plaintiff fully supported this determination. (*See* Pl.'s Dep., dated Nov. 18, 2004 ("Pl.'s Dep."), at 57.)

## II.     *Formation of the Middle Management Association*

In or about December 2001, many middle management employees, including

Plaintiff, expressed an interest in forming an employee association pursuant to New York State's Taylor Law.[2] The District contends that it encouraged the formation of this association but believed that it should go through the formal certification process before the New York State Public Employment Relations Board (the "PERB") and that some confidential positions should be excluded from the bargaining unit. A certification petition was filed with the PERB in January 2002 and a middle management association later formed in September 2002.

Plaintiff asserts, however, that Dr. Brennan was "very much against" the formation of this employee association. (Pl.'s Aff. ¶ 22.) She further states that "[i]t is without question that [she] was an unspoken leader among the middle management group, as demonstrated by the fact that [she] was the only middle management employee to speak at the Executive Session on May 7, 2001, even though other middle managers were present." (*Id.* ¶ 23.) She further contends that although she was nominated in September 2001 to lead the group as President of any future association, because her relationship with Brennan became "hostile" in May 2001, she asked Kevin Wurtz if "he would be willing to take on the role of President of any future collective bargaining group [while she] retained the position of Vice President." (*Id.* ¶¶ 23-24.)

### III. *The Elimination of Plaintiff's Position*

In May 2002, the District voters rejected the proposed school budget for the 2002-2003 school year. That same month, Dr. Brennan informed Plaintiff that he would recommend that the Board eliminate her position as part of the budget cuts.

---

[2] The Taylor Law governs public employee collective bargaining. *See* N.Y. Civil Serv. Law § 210 et seq.

According to the District, in response to the budget cut, Dr. Brennan asked Dr. Shea, Assistant Superintendent for Personnel and District Services, and Dr. Aldrich, Business Administrator, to review all administrative positions and suggest possible eliminations. (Def.'s Rule 56.1 Stmt. ¶ 24.) As a result, Dr. Shea and Dr. Aldrich wrote a report entitled "Administrative Reorganizations and Consolidations" which is dated June 27, 2002. (*Id.* ¶ 25.) Based upon four criteria, their report concluded that the District could eliminate three positions, to wit, the Director of Plant Facilities, the Manager of "IMC," and Plaintiff's position. (*Id.* ¶ 26.) The Board subsequently voted to eliminate these three positions in June 2002. (*Id.* ¶ 34.) The District contends that it offered Plaintiff the position of senior programmer analyst but Plaintiff rejected that position. (*Id.* ¶ 29.)

The District also maintains that although it viewed Plaintiff as a "valued and worthwhile employee," the Win Cap purchase greatly impacted their decision to eliminate her position as the new software eliminated the need for an individual to perform some of Plaintiff's work duties. (Def.'s Ex. F at 53.) Eliminating her position saved the District $108,000. (Def.'s Ex. E at 75.)

Plaintiff asserts that "in reality," hers was the only position being eliminated as the Manager of IMC retired and "it was public knowledge that the Director of Plant Facilities had already been interviewing for some time for a Superintendent of Business position in other school districts," one of which he ultimately received. (Pl.'s Aff. ¶ 17.) She also disputes the District's contention that she was offered another position. (*Id.* 19.)[3]

---

[3] The Court notes that this contention contradicts Plaintiff's prior sworn testimony where she states that she was aware of this offer but turned it down because the salary was substantially less and it was a subordinate position. (Def.'s Ex. E at 75-76.)

The parties agree that Paul Derkash ("Derkash"), the attorney representing the middle management employees in the PERB certification petition, met with Dr. Brennan just before the District eliminated Plaintiff's position and asked if the District would give Plaintiff six months to look for another job before officially terminating her employment. The District contends that the Board approved this request. (Def.'s Rule 56.1 Stmt. ¶ 33.) Plaintiff concedes that the Board granted her request but challenges the length of time she was actually permitted to stay on.[4] (Pl.'s Aff. ¶ 20.)

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir.

---

[4] Plaintiff claims that although the Board voted to eliminate her position in June 2002, she was not given formal notification until September 2002. (Pl.'s Aff. ¶ 20.)

1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not

'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.     First Amendment Retaliation

A public employee making a First Amendment retaliation claim under Section 1983 must initially demonstrate by a preponderance of the evidence: (1) that her speech addressed a matter of public concern, (2) that she suffered an adverse employment action, and (3) that a causal connection existed between the speech and the adverse employment action, in that the speech was a motivating factor for the action. *See Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003). If a plaintiff establishes these three factors, the burden shifts to the defendant to show by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the employee's protected speech. *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).

In the instant case, Plaintiff's First Amendment retaliation claim is based upon her comments regarding the District's potential purchase of computer software and her involvement in the formation of a middle management association. The Court will discuss each one separately.

### A.     Purchase of Computer Software

With regard to Plaintiff's comments on Finance Manager, Defendant contends that Plaintiff cannot meet the first and third elements of her prima facie case, i.e, that her comments addressed a matter of public concern and that her comments were a motivating factor for the elimination of her position.[5] Because the Court finds that Plaintiff's speech is not entitled

---

[5] Defendant does not dispute that the elimination of Plaintiff's position constitutes an adverse employment action. (*See* Def.'s Mem. at 11 n.3.)

to constitutional protection as a matter of law, the Court need not, and does not, address the third element.

The question of whether an employee's speech addresses a matter of public concern is one of law, not fact. *See Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983); *see also Morris*, 196 F.3d at 110. "Speech by a public employee is on a matter of public concern if it relates 'to any matter of political, social, or other concern to the community.'" *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (quoting *Connick*, 461 U.S. at 146). "If the speech, however, is focused on matters personal to the employee, it cannot be classified as being on a matter of public concern and the government, acting as an employer, 'has greater latitude to discipline' the employee." *Id.* (quoting *Connick*, 461 U.S. at 146). As explained by the Supreme Court:

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Connick*, 461 U.S. at 149. Finally, "'[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.'" *Johnson*, 342 F.2d at 112 (quoting *Connick*, 461 U.S. at 147-48).

Here, Plaintiff contends that her comments about the purchase of Finance Manager, a computer software program, are protected under the First Amendment because they addressed a matter of public concern. In this vein, she claims that "the decision regarding the purchase of software for the District was a major action that affected District administration and

taxpayers." (Pl.'s Mem. at 7.) She explains:

> Converting to Finance Manager, a financial/payroll system with "serious shortcomings," would have been a financial disaster for the District. The costs of overtime to address the many areas where Finance Manager was deficient, along with the great likelihood that we would be facing many penalties for being unable to properly complete payrolls or other mandated functions, would cost the taxpayer unnecessary and unplanned expenditures. Also, any resulting decline in the Town of Huntington's assessment of the District would increase the interest rate at which the District is able to borrow money in anticipation of their [sic] state aid, and this would also result in costing the taxpayer additional unnecessary expenditures.

(Pl.'s Aff. ¶ 11.) Plaintiff further contends that her formal presentation to the Board in a closed meeting was unusual as typically, a recommendation regarding the purchase of software or equipment would be made by the assistant superintendent and then acted upon by the Board. (*Id.* ¶ 8; Pl.'s Mem. at 7.) Plaintiff claims that "[t]his [process] was out of the ordinary, and a sign that it was a controversial and contentious issue." (Pl.'s Aff. ¶ 8.) The Court finds Plaintiff's arguments wholly unpersuasive and holds as a matter of law that her comments did not address matters of public concern.

As an initial matter, there is nothing in the New York Education Law, which governs expenditures by the Board, which suggests that the public had any interest in this purchase. Plaintiff spoke to the Board in a non-public, executive session about computer software programs. She alleges that because of her "strong position against Finance Manager," she angered some District employees who consequently eliminated her position.[6] The public, however, had no right to attend the Board meeting and had no right to vote on the Board decision

---

[6] Notably, the Board adopted her recommendation and did not purchase the software.

to purchase software.  Although the public does have some interest in knowing how the District spends public funds, *see* N.Y. Educ. Law § 1716, the Education Law merely requires boards of education of union free school districts to hold annual public hearings on the school budget.  *Id.*  After the budget vote, the public only has an interest in the board keeping its total annual expenditures within that voter-approved budget.  *See id.* § 1718(1) (prohibiting boards of education from incurring liability in excess of amount approved by voters).  Indeed, the Education Law requires the board of education, not the public, to approve payments from the school district's accounts.  *Id.* § 1720(2).  Thus, in this case, once the public approved the annual budget, purchases, such as computer software, were within the Board's discretion, thereby belying Plaintiff's claim that the Board's review of computer software programs was of "concern to the community."

Moreover, although Plaintiff characterizes her comments as regarding a potential misappropriation of District funds, an examination of the record reveals that, in fact, there is no evidence to suggest that Plaintiff ever discussed the financial implications of the software purchase or the effect on taxpayers.  Rather, she simply evaluated whether the software at issue was the best choice for the District.  *Compare Johnson*, 342 F.3d at 113 (finding plaintiff's letter concerning "the alleged unlawful and corruptive practices of the [local city] administration" was a matter of public concern; "[D]iscussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern.") (citation and internal quotation marks omitted); *Mandell*, 316 F.3d at 383 (finding that plaintiff's testimony which "criticized [police] department's approach to fighting organized crime, its resistance to change, and its systemic racism and anti-Semitism . . . [were] clearly matters of public concern").

In a case similar to the instant one, a district court explored whether the First Amendment protected a public employee's speech on his employer's purchase of new computer switches. *See Riaz v. Lyons Township High School Dist.*, No. 02 C 4596, 2005 WL 1863447 (N.D. Ill. May 20, 2005). In finding that the speech was not protected, the court noted

> [Plaintiff] believes that his comment criticizing the purchase of $250,000 worth of computer switches is speech on a matter of public concern because he was speaking out about "what he believed to be a misappropriation of public funds." . . . Contrary to [Plaintiff's] characterization, his speech related less to misappropriation of funds and was more a dispute over "how" a task in the office should be carried out in the office. Accordingly, it does not qualify as a matter of public concern.

*Id.* at *7. Similarly, here, Plaintiff's "after the fact efforts to expand her grievance into a public issue is insufficient to make the subject of her speech a matter of public concern." *Harris v. Beedle*, 845 F. Supp. 1030, 1034 (S.D.N.Y. 1994), *aff'd*, 35 F.3d 552 (2d Cir. 1994).

In sum, the Court finds that Plaintiff's speech concerning the District's potential purchase of computer software is not entitled to constitutional protection. Accordingly, the Court grants the District's motion for summary judgment on the First Amendment retaliation claim to the extent such claim is based upon Plaintiff's comments concerning the District's purchase of computer software.

### B.     *The Middle Management Employee Association*

Preliminarily, the Court notes that it is unclear from Plaintiff's brief to what extent she is basing her retaliation claims on her involvement in the middle management association. Included in a section entitled "FACTS PRECLUDING SUMMARY JUDGMENT," Plaintiff discusses how in 2001, she led efforts to form a collective bargaining unit for middle management employees. (*See* Pl.'s Mem. at 2.) She further claims that because her relationship

with Dr. Brennan became "adversarial and hostile in May 2001," she asked Kevin Wurtz to take on the role of President while she retained the position of Vice President. (*Id.*) In her section entitled "Plaintiff's Speech was Constitutionally Protected," however, she makes no mention of her involvement in the association. Instead, she focuses solely on her comments regarding the computer software. Despite this omission, she later argues that there exists a causal connection between Defendant's efforts to terminate her employment "immediately after Plaintiff's May 4, 2001 memorandum to Germaine, her May 7, 2001 speech at the Executive Board session, *and her integral involvement in the formation of a middle management collective bargaining unit*." (*Id.* at 8 (emphasis added).) She continues:

> The timing here is instructive. Plaintiff, an outspoken employee, as evidenced by her leadership in the formation of a middle management collective bargaining unit, spoke out against a District purchase endorsed by Dr. Brennan, the District Superintendent, and Germaine, the District's purchasing agent. Immediately following her protected speech, Plaintiff experienced retaliation that ultimately led to her termination.

(*Id.* at 9 (citations to record omitted).)

Assuming arguendo that Plaintiff's involvement in the association was protected under the First Amendment, Plaintiff's claim would nonetheless fail as there is no evidence in the record which suggests the existence of a causal connection between her involvement and the adverse employment action. As explained by the Second Circuit:

> The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech. Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.

-13-

> Summary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision.

*Morris*, 196 F.3d at 110 (citations omitted).

Here, the only evidence Plaintiff has presented on this claim is her own affidavit which indicates that in May 2001, she was the only middle management employee to speak at the Executive Session even though other middle managers were present. (*Id.* ¶ 23.) She further contends that Dr. Brennan was very much against the formation of the association, that her relationship with him became "hostile" in May 2001 because of her stance on Finance Manager, and that due to this hostility, she did not accept the association's nomination to be President but accepted the Vice President position instead. (*See* Pl.'s Aff.) This evidence is insufficient to establish a causal connection between Plaintiff's participation in the middle management association and the elimination of her position.

Preliminarily, the Court notes that other than Plaintiff's own conclusory assertions, she presents no direct evidence of retaliatory animus. *See Morris*, 196 F.3d at 111 ("Plaintiffs may not rely on conclusory assertions of retaliatory motive, but must offer instead some tangible proof to demonstrate that their version of what occurred was not imaginary."). As for circumstantial evidence, Plaintiff argues that her position was eliminated immediately after her protected speech. Her affidavit, however, only discusses her involvement in the association in May and September of 2001. In May 2002, Plaintiff was informed by Dr. Brennan that he would recommend that the Board eliminate her position. While the Second Circuit has not established a bright line rule for determining whether retaliatory conduct "followed closely" a plaintiff's protected activity, *see Gorman-Bakos v. Cornell Coop. Extension of Schenectady*

*County*, 252 F.3d 545, 554 (2d Cir. 2001), courts in the Second Circuit have rejected finding a causal inference when there were gaps of four, five, or six months between the protected activity and the alleged retaliation. *See Diaz v. Weill Med. Ctr. of Cornell Univ.*, No. 02 Civ. 7380, 2004 WL 285947, at *22 (S.D.N.Y. Feb. 13, 2004) (collecting cases), *aff'd*, 138 Fed. Appx. 362 (2d Cir. 2005). Here, the eight-month interval, standing alone, is insufficient to demonstrate causation and survive Defendant's motion for summary judgment.

Moreover, Plaintiff's argument completely ignores the budget failure in May 2002, which immediately preceded the decision to eliminate her position. Accordingly, because Plaintiff has not proffered any facts which would suffice to create a genuine issue of material fact as to whether the elimination of her position was substantially motivated by her involvement in the formation of the association, Plaintiff's First Amendment retaliation claim is dismissed.

### III.    *Fourteenth Amendment Retaliation*

In addition to her claim of a First Amendment violation, Plaintiff's first cause of action also asserts a violation of the Equal Protection Clause of the Fourteenth Amendment. The arguments in Plaintiff's brief, however, are confined to a claimed First Amendment violation. (*See* Pl.'s Mem. at 1 ("[T]his memorandum only addresses Plaintiff's first federal claim for violation of the First Amendment.").) Given Plaintiff's apparent abandonment of this claim, and the complete absence of any evidence on this issue in the record, Plaintiff's claimed violation of the Fourteenth Amendment is dismissed.

### *CONCLUSION*

For all of the above reasons, Defendant's motion for summary judgment is GRANTED and this case is DISMISSED in its entirety. The Clerk of Court is directed to

CLOSE this case.

**SO ORDERED.**

Dated: March 17, 2006
      Central Islip, New York        /s
                                      Denis R. Hurley,
                                      United States District Judge